UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DIEGO GONZALEZ,<br><br>        Petitioner,<br><br>    v.<br><br>WILLIAM KNIPP, Warden,<br><br>        Respondent.<br>_____/ | No. C-12-4557 EMC (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I.   INTRODUCTION

Diego Gonzalez filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed an answer to the petition. Mr. Gonzalez did not file a traverse, and the deadline by which to do so has long passed. For the reasons discussed below, the Court **DENIES** the petition.

## II.   BACKGROUND

A.   Facts

The charges against Gonzalez arose from two separate incidents: On December 6, 2005, Gonzalez sexually assaulted and robbed Doe I in a hotel room in Walnut Creek; and on December 1, 2006, Gonzalez sexually assaulted and robbed Doe II in a hotel room in Concord. After a third victim reported an attempted forcible rape in a hotel room in Walnut Creek on December 15, 2006, Gonzalez was arrested and charged with felony offenses as against all three victims. Before trial, the court granted the prosecutor's motion to dismiss the charges relating to the third victim. A jury trial was held in July 2008 regarding the charges concerning Doe I and Doe II.

**A. Doe I Incident**

Doe I, testifying pursuant to a subpoena, stated she was a prostitute from March 2004 to January 2008. She offered services ranging from massages to other sexual favors. She

visited men at their homes and used hotels. She would pay for the hotel rooms. On December 6, 2005, Gonzalez contacted Doe I by using her Internet contact information. They arranged to meet at a hotel in Walnut Creek. Doe I booked a hotel room for her meeting with Gonzalez. When she was inside the room, Gonzalez called Doe I, and she told him the room number. Once in the hotel room, Doe I and Gonzalez discussed her services and his payments for the services. As Doe I went to the room door, Gonzalez grabbed her and put a knife to her throat. She never actually saw the knife, but felt it and it left a red scratch or a slight cut on her throat. Gonzalez said, "Shut up. Don't scream. Don't say anything." He forced her to lay down on the bed face first while he still kept the knife at her throat. Doe I thought she was going to die. Gonzalez said, "Don't move or I'm going to kill you. I'm going to cut you." Gonzalez asked Doe I for her money. She told him her wallet was in the first drawer underneath the television. The wallet contained her personal cards, credit cards, about $500 in cash, and her driver's license with her true name and address. Gonzalez told Doe I to get her wallet and give him $150. Gonzalez later asked Doe I if she remembered "the kid from last week who wasn't happy with his services, this is for him." While still being held by Gonzalez, Doe I got up and gave him $150 from her wallet.

Gonzalez then forced Doe I back to the bed, and told her to take off her clothes. He still had a knife at her throat. He told Doe I to get on all fours on the bed. He then started licking Doe I on her body, including her vaginal area and anus for several minutes. Doe I did not do anything because Gonzalez told her he was going to hurt her if she fought him. After he finished, Gonzalez whispered in her ear in an aggressive manner: "This never happened. I didn't hurt you. Don't move. Don't run. I'm going to get you. I know where you live. I know everything about you." Gonzalez also told Doe I not to call the police. Gonzalez then grabbed Doe I's wallet and cell telephone and he ran out the door. After Gonzalez left, Doe I called the hotel front desk and asked that security try to stop Gonzalez. Doe I then called the police. When the police arrived at her hotel room, Doe I said she had been sexually assaulted and robbed. She did not tell the police the truth about how Gonzalez came to be in the room because she knew her prostitution activity was illegal. Doe I checked out of the hotel that night.

\*   \*   \*

**B. Doe II Incident**

Doe II, testifying pursuant to a subpoena, stated that since September 2005 she had been working as an escort and charged money for sex. She advertised on the Internet, and she accepted cash and gifts for her services.

On December 1, 2006, Gonzalez called Doe II on the cell telephone number she listed on the Internet. He said he had seen her before and she would remember him when they saw each other. They arranged to meet at a Concord hotel for a one hour session; she told him the price would be $300. Doe II already had a room at the hotel because she had a previous date that day and she had kept the key to the room. Her practice was that if she got a call, she would keep the hotel room key for the day in case she had to go back and use her room again.

Doe II arrived first at the hotel room and prepared to meet Gonzalez. She always prepared herself before her "calls." She put on stockings, baby doll underwear, a bra and wrapped a towel around herself. While she was getting dressed, she drank a beer. Gonzalez came to the door, and she let him inside. Once inside, Doe II said she had never seen Gonzalez before that night. Gonzalez replied she did not remember him because he used to have long hair and he had cut it. Doe II insisted she did not remember Gonzalez's face. When Gonzalez asked for a peek, Doe II told him he first had to put a "donation" or money on the table. Gonzalez insisted on a peek before giving her the donation. Doe II said she was

2

not going to give him a peek. But, she lifted a towel, showing her panties, and said, "There, you could take a peek.... Now give me the donation." Gonzalez put his hand in his pocket, indicating he had a donation for her. Doe II sat on the bed, and continued to tell Gonzalez to pay the donation. When she got up and turned slightly around with her back towards him, Gonzalez grabbed her "[l]ike a bear hug" from the back and showed her a knife before putting it to her throat. She could see the knife was all silver and shiny, and long; it was a "folding" or "buck" knife. It was "real scary" because the room lights were off and only the light from the television illuminated the room. Gonzalez said, "Don't move. Shut up and don't move. Don't scream." Doe II begged Gonzalez not to kill her because she had a little girl waiting for her. Gonzalez asked how he should know she was not lying. Doe II offered to show him a picture of her daughter. Doe II also offered to do anything he wanted her to do. She asked Gonzalez to put the knife away. He replied they were going to have some fun, and he would keep the knife next to him so that Doe II did not run out the door. The knife was kept in an open position either on the bed right next to them or on a nearby table where Gonzalez could just grab it. Doe II disrobed, Gonzalez pulled his pants down, and he allowed Doe II to put a condom on his penis. In response to his demands, she orally copulated him for five minutes. She felt she had no choice but to comply with Gonzalez's requests because he was armed with a knife and she thought he was going to kill her if she did not cooperate with him. He then had forcible sexual intercourse with Doe II for about fifteen minutes. He then demanded that she orally copulate him without a condom for five minutes, and then he had forcible sexual intercourse with her wearing a condom for fifteen minutes. He ejaculated into the condom. He then got up, removed the condom, cleaned himself, and pulled his pants up. At this point Doe II did not see the knife.

   Gonzalez asked Doe II for her telephone. He erased the calls with his telephone number that were on Doe II's telephone. Even though she did not recall ever seeing Gonzalez before, he told her not to call the police, "or he will come back and [he would] get [her]." He said he knew where she lived, saying the name of the street where she lived, and that she lived in a one-bedroom apartment. Although she told Gonzalez she had no money, he demanded she open her purse. He took "a good amount of money" that she had in her purse. She did not recall how much money Gonzalez actually took, but it was more than $100; "maybe like 140 or 180," or "200 ." After Gonzalez left the room, Doe II got dressed. She wrapped the used condom in toilet paper, put it in her purse, and left the hotel room.

Cal. Ct. App. Opinion at 2-6 (footnote omitted). Gonzalez did not testify in his defense, nor did he present any witnesses. *Id.* at 7.

B. Procedural History

   Mr. Gonzalez was convicted in Contra Costa County Superior Court of three counts of forcible oral copulation, two counts of forcible rape, two counts of first degree robbery, one count of making a criminal threat, and one count of dissuading a witness from testifying. The trier of fact found true weapon enhancement allegations. On March 23, 2009, Mr. Gonzalez was sentenced to 50 years to life in state prison.

   Mr. Gonzalez appealed. The California Court of Appeal affirmed the judgment of conviction and the California Supreme Court denied his petition for review.

3

1    Mr. Gonzalez then filed this action. His petition for writ of habeas corpus presents two
2 claims. First, he contends that his rights to due process and trial by jury were violated when the trial
3 judge instructed the jury that "'an occupied hotel room constituted an inhabited dwelling' as a
4 matter of law." Docket # 1 at 13. Second, he contends that his sentence amounts to cruel and
5 unusual punishment prohibited by the Eighth Amendment. Mr. Gonzalez alleged three additional
6 claims in an amended petition, but those claims were rejected as untimely filed. *See* Docket # 14.

### III. JURISDICTION AND VENUE

8    This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C.
9 § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the
10 conviction and sentence of a person convicted in Contra Costa County, California, which is within
11 this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV. STANDARD OF REVIEW

13    This Court may entertain a petition for writ of habeas corpus "in behalf of a person in
14 custody pursuant to the judgment of a State court only on the ground that he is in custody in
15 violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

16    The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to
17 impose new restrictions on federal habeas review. A petition may not be granted with respect to any
18 claim that was adjudicated on the merits in state court unless the state court's adjudication of the
19 claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,
20 clearly established Federal law, as determined by the Supreme Court of the United States; or
21 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the
22 evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

23    "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court
24 arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the
25 state court decides a case differently than [the] Court has on a set of materially indistinguishable
26 facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

27    "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the
28 state court identifies the correct governing legal principle from [the Supreme] Court's decisions but

4

unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

## V.  DISCUSSION

### A.  Instructional Error Claim

As relevant here, first degree robbery is a robbery "perpetrated in an inhabited dwelling house," and most other robberies are second degree robberies. *See* Cal. Penal Code § 212.5. Mr. Gonzalez argues that the trial court invaded the province of the jury and removed the "inhabited dwelling" element of first degree robbery when it instructed the jury that, "under the law, an occupied hotel room for which a room fee has been paid is an inhabited dwelling."

#### 1.  State Court Proceedings

At Mr. Gonzalez's trial, the jury was given the following instruction on robbery:

"Robbery is divided into two degrees. If you conclude that the defendant committed a robbery, you must then decide the degree. [¶] To prove that the defendant is guilty of first degree robbery, the People must prove that: [¶] The robbery was committed in an inhabited dwelling. A dwelling is inhabited if someone lives there and either is present or has left but intends to return. Under the law, an occupied hotel room for which room a fee has been paid is an inhabited dwelling. [¶] All other robberies are of the second degree. [Footnote 6] [¶] The People have the burden of proving beyond a reasonable doubt that the robbery was first degree rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree robbery. If, and only if, you find that the defendant is not guilty of first degree robbery, you must then go on to consider whether [the] defendant is guilty of second degree robbery. If the People have not met the burden of proving beyond a reasonable doubt that the defendant is guilty of second degree robbery, then you must also find the defendant not guilty of second degree robbery." Defense counsel lodged no objections to the instructions.

> Footnote 6: At this point in the rendition of the instructions in open court, the judge included the following extemporaneous sentence: "If it's not an inhabited dwelling, if you find it's not inhabited, you will go on to consider whether or not you have second degree robbery which is all robberies as defined in the previous discussion."

During closing argument, the prosecutor argued that with respect to Gonzalez's robbery of Doe I, the only issue for the jury's consideration was the distinction between first degree robbery and second degree robbery: "You heard the Judge instruct you that under the law an occupied hotel room for which a fee has been paid is an inhabited dwelling. [¶] I'll submit to you that under these circumstances ... she's in there. It's occupied. She paid a fee.

5

> [¶] I wasn't under the impression that she was living there or staying there overnight. I will submit to you, if there is an issue, it's a question of whether it's a first degree or second degree robbery. That's an issue for you to determine. [¶] If you decide it's occupied, he's guilty of a first degree. If you decide it's something more transitory, he's guilty of a second degree." The prosecutor later argued: "So, again, with regard to the robbery, the only issue is whether it's a first degree or second degree robbery. [¶] ... [¶] ... [I]f all twelve of you agree that I have not proven that it is an inhabited dwelling, all twelve of you have to agree to that though, then you could go to the lesser-included offense of second degree robbery. [¶] ... It's at least a second degree. If you find ... it not inhabited, and it's a second degree, I submit to you the fact that she had been there before, she had returned to that location, it was night time, she had her personal property stored in parts of the hotel room. It's sufficient, but if you find that it [was] not inhabited, it's certainly a second degree robbery." In arguing the count of robbery as regarding Doe II, the prosecutor made no comments as to whether Gonzalez's robbery of Doe II was a first degree or second degree robbery.
>
> During closing argument, defense counsel made no specific comments regarding the elements of the offenses, or the prosecutor's arguments regarding the difference between first degree robbery and second degree robbery. The entire premise of defense counsel's argument was that the victims were not credible and the prosecution had failed to proffer any evidence corroborating the testimony of the victims.

Cal. Ct. App. Opinion at 7-8.

The California Court of Appeal rejected Mr. Gonzalez's challenge to the jury instruction. The court explained that the instruction was derived from a published California case that addressed a predecessor statute to the current robbery statute, *People v. Fleetwood*, 171 Cal. App. 3d 982 (Cal. Ct. App. 1985), which had upheld an instruction similar to that used in Mr. Gonzalez's case. In *Fleetwood*, the jury was instructed that an "inhabited dwelling house within the meaning of Penal Code section 213.5 [i.e., the predecessor statute to § 212.5] is a structure which is occupied and customarily used as a dwelling. An occupied hotel room is an inhabited dwelling as used in these instructions." *Fleetwood*, 171 Cal. App. 3d at 986 (bracketed material added). *Fleetwood* rejected the argument that the robbery statute did not apply to hotel rooms; such rooms had historically and traditionally been included within the definition of a dwelling house. Cal. Ct. App. Opinion at 10 (citing *Fleetwood*, 171 Cal. App. 3d at 988).

The California Court of Appeal in Mr. Gonzalez's case also rejected the argument that the instruction "directed a verdict on the element of whether the victims' hotel rooms were inhabited dwellings," noting that the instruction was "very similar to instructions that have withstood arguments of directed verdicts on the same ground." *Id.* (citing *People v. Thorn*, 176 Cal. App. 4th 255, 267-68 (Cal. Ct. App. 2009) (rejecting argument that court directed a verdict on the "inhabited

dwelling" element when it instructed that a "carport that is attached to an inhabited dwelling house is part of the inhabited dwelling house"), and *People v. Fox*, 58 Cal. App. 4th 1041, 1047 (Cal. Ct. App. 1997) (rejecting argument that court directed a verdict on the "inhabited dwelling" element when it instructed jury that "[w]here a garage is attached to an inhabited dwelling house and is, therefore, not a separate structure, it is considered to be *part of* the inhabited structure")). Following reasoning similar to that in *Thorn* and *Fox*, the state appellate court here concluded that the jury instructions given in Mr. Gonzalez's case "required the jury to determine whether Gonzalez had committed a robbery in an inhabited dwelling before returning a guilty verdict of first degree robbery. The jury could not return a guilty verdict unless it found the victims' hotel rooms were inhabited dwellings. Had the jury determined the victims' hotel rooms were not inhabited, it would have been obligated to return a not guilty verdict on the first degree robbery charges. Unlike the cases cited by Gonzalez, the court here did not instruct the jury that the victims' hotel rooms were inhabited dwellings." Cal. Ct. App. Opinion at 12.

The California Court of Appeal further determined that, even if there had been an error, it would have been harmless error. The term "inhabited dwelling house" had been given a "broad, inclusive definition," and determining whether a structure was inhabited or uninhabited turned "on the character of the use of the building" as viewed from the perspective of the victim rather than the criminal. *Id.* (quoting *People v. Long*, 189 Cal. App. 4th 826 (Cal. Ct. App. 2010)).

> '[T]he proper question is whether the nature of a structure's composition is such that a reasonable person would expect some protection from unauthorized intrusion.' [Citation.]" [Citation.]' " (*Id.* at ¶. 834–835.) "[A] popular test for whether a building is 'inhabited' is whether someone is using it as a temporary living quarters; [or] whether the building is serving as the functional equivalent of a home away from home. This characterization should be made from the perspective of the victim [citation], not the criminal. [Citation.]" (*Id.* at p. 837.)
>
> In this case, the evidence demonstrates that each victim used the hotel room as a home away from home to perform intimate sexual activities. The victims' use of hotel rooms allowed them to "let their guard down," making them psychologically vulnerable to Gonzalez's criminal conduct. *(People v. Jackson* (1992) 6 Cal.App.4th 1185, 1191.) "From the victim[s'] psychological standpoint[s]," the robbery was no different than a robbery committed by some person inside the victims' permanent residences; "[i]n either case, the victim [s] assume[d] an enhanced level of security and privacy which [was] violated by the crime[s]." (*Ibid*.) Gonzalez's argument that the hotel rooms were used for nothing more than to transact the business of prostitution is not persuasive. The victims' anticipation of receiving money from Gonzalez should not be "regarded as transforming [their] [h]otel room[s] into some kind of uninhabited office[s]."

7

*Id.* at 12-13 (citations omitted).

As part of its evaluation of Mr. Gonzalez's instructional error claim, the California Court of Appeal implicitly determined, as a matter of state law, that an occupied hotel room for which a fee has been paid is an inhabited dwelling. *See* Cal. Ct. App. Opinion at 9-10 & nn.7-8. This definition was substantially similar to that given by the court in *People v. Fleetwood*, 171 Cal. App. 3d at 988 (defining an "occupied hotel room" an inhabited dwelling). A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). Thus, the starting point in the analysis of Mr. Gonzalez's habeas challenge to the jury instruction is to accept that the law of California is that a hotel room that is occupied and for which a fee has been paid is an "inhabited dwelling" within the meaning of the robbery statute, California Penal Code section 212.5.

    2.    <u>Analysis of Federal Constitutional Claim</u>

The U.S. Constitution's Fourteenth Amendment "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "[T]he State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." *Middleton v. McNeil*, 541 U.S. 437 (2004) (omission in original; citation omitted). A State may not use evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of proof beyond a reasonable doubt of every essential element of a crime. *See Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979). Nor may a judge invade the province of the jury by entering a judgment of conviction or directing the jury to come forward with such a verdict. *See United*

1  *States v. Martin Linen Supply Co.*, 430 U.S. 564, 572-73 (1977) (citing *Sparf & Hansen v. United*
2  *States*, 156 U.S. 51, 105 (1895), and *Carpenters v. United States*, 330 U.S. 395, 408 (1947)).[1]

3       If a constitutional error in the jury instruction is found, the federal habeas court also must
4  determine whether that error was harmless by looking at the actual impact of the error. *Calderon v.*
5  *Coleman*, 525 U.S. 141, 146-47 (1998). The habeas court must apply the harmless-error test set
6  forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and determine whether the error had a
7  "'substantial and injurious effect or influence in determining the jury's verdict.'" *Hedgpeth v.*
8  *Pulido*, 555 U.S. 57, 58 (2008) (per curiam) (quoting *Brecht*, 507 U.S. at 623).

9       Although the AEDPA limits the source of clearly established law to the holdings of the U.S.
10 Supreme Court, three Ninth Circuit cases illustrate the application of the rule that the Due Process
11 Clause prohibits a jury instruction that displaces the jury's role in finding each element of an offense
12 proven beyond a reasonable doubt. *See Stanton v. Benzler*, 146 F.3d 726 (9th Cir. 1998), *Medley v.*
13 *Runnels*, 506 F.3d 857 (9th Cir. 2007) (en banc), and *United States v. Smith*, 520 F.3d 1097 (9th Cir.
14 2008). Those cases, in turn, are helpful in this court's analysis as to whether the jury instruction
15 here eliminated the requirement that the jury find, upon proof beyond a reasonable doubt, that Mr.
16 Gonzalez had committed a robbery in an inhabited dwelling.

17      In *Stanton v. Benzler*, 146 F.3d 726, the petitioner was on trial for first degree murder with
18 the special circumstance of murder by administration of "poison" where the facts showed the
19 victim's body had traces of arsenic trioxide. *See* Cal. Penal Code § 189 (first degree murder
20 includes "murder which is perpetrated by means of . . . poison"). The trial court instructed the jury
21 on the elements of the crime, i.e., that the jury had to find that the killing was intentional and that the
22 defendant committed the murder by the administration of poison. *Id.* at 727. The instructions
23 continued: "'The word "poison" means any substance introduced into the body by any means
24 which by its chemical action is capable of causing death. [¶] Arsenic trioxide is a poison.'" *Id.* at
25 727-28. The Ninth Circuit rejected the argument that this instruction removed an element of the

---

[1] The rule against directed verdicts for the prosecution was recognized as long-established in *Martin Linen*, although that case did not involve such a verdict. Instead, the question in *Martin Linen* concerned the effect of a judgment of acquittal; the Supreme Court held that the Double Jeopardy Clause barred retrial of a criminal defendant following a judgment of acquittal.

offense from the jury's consideration in violation of the petitioner's constitutional rights because "[t]his state law determination – that arsenic trioxide is a poison as a matter of law and is not an element of the offense to be decided by the jury – is not open to challenge on habeas review." *Id.* at 728.

In *Medley v. Runnels*, 506 F.3d 857, the petitioner received a sentence enhancement for discharge of a "firearm" during the commission of an offense, and evidence had been presented that he shot a flare gun at the victim. He argued that the jury instructions resulted in the jury not making all the necessary findings to determine that the flare gun the petitioner used was a firearm. The statute defined a "firearm" as "'any device *designed to be used as a weapon*, from which is expelled through a barrel, a projectile by the force of any explosion, or other form of combustion.'" *Medley*, 506 F.3d at 860 (quoting Cal. Penal Code § 12001(b) (emphasis added)). Before trial, the judge announced that, if an expert testified that a flare gun operated that way (i.e., expulsion of a projectile through a barrel by the force of any explosion or other combustion), then "the issue is moot" and the flare gun would qualify as a firearm. *Medley,* 506 F.3d at 860. At trial, an "expert witness testified that a flare gun operates by expelling a flare through a tube by means of an explosion similar to how an ordinary firearm operates. The judge then instructed the jury that '[a] flare gun is a firearm.'" *Id.* (alteration in original)  The State argued that the jury instructions "merely provided the jury with a legal interpretation of the word 'firearm.'" *Id.* at 863. The Ninth Circuit disagreed and held that, by instructing the jury that a flare gun is a firearm, the trial court removed from the jury's consideration the critical question of whether the flare gun was designed to be used as a weapon. *Id.* at 864. The instruction could not be treated simply as an interpretation of state law because of the "lack of precedent on the meaning of 'designed to be used as a weapon.'" *Id.* at 865.

> If the California Supreme Court had held that, as a matter of law, a flare gun is a firearm under the statute, or that a flare gun, as a matter of law, is designed to be used as a weapon, then the trial court could plausibly be said to have been applying state law. However, there is no such precedent, and at oral argument the State acknowledged that the trial court never explicitly ruled on whether "designed to be used as a weapon" is an element of the offense – although the court implicitly treated it as not being an element. To ignore the "designed to be used as a weapon" sub-element, or *sub silentio* to treat it as a non-element, might be acceptable when there is clearly established precedent or when the clear language of the statute supports the court's actions, but a trial court does not interpret state law by ignoring an element of the offense.

*Id.* at 865-66.  The court distinguished *Stanton* by noting that the state appellate court in *Stanton* had held that arsenic trioxide is a poison under various other California statutes and was not a factual question for the jury to decide.  *Id.* at 866.[2]  Habeas relief was granted in *Medley* because the "instruction took a critical issue of fact away from the jury in violation of clearly established constitutional law" by not requiring a jury determination as to whether the flare gun was "designed to be used as a weapon."  *Id.* at 867-68; *see id.* at 868 (remanding with instructions for district court to issue a conditional writ directing the State to either resentence without the firearm enhancement or to retry that charge).

The third illustrative case is *United States v. Smith*, 520 F.3d 1087, in which the defendant was charged with assault with a "dangerous weapon" in a case in which evidence was presented that the victim was stabbed with a prison-made knife of the sort manufactured by prisoners melting down portions of very thin dinner trays and sharpening them to a point.  The Ninth Circuit had previously held that dangerous weapons under the relevant statute include "not only objects that are dangerous per se, but also objects used in a way capable of causing death or serious bodily injury."  *Smith*, 520 F.3d at 1101.  The district court instructed the jury that the Government had to prove that (1) the defendant "'intentionally struck or wounded'" the victim; (2) "'the defendant acted with the specific intent to do bodily harm'" to the victim; and (3) "'the defendant used a prison-made knife.  A prison-made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury.'"  *Id.* at 1102.  The Ninth Circuit rejected the argument that this instruction relieved the Government of its obligation to prove beyond a reasonable doubt that the defendant used a "dangerous weapon."  *Id.*  Although it would have been preferable for the instruction to have used the words "dangerous weapon" instead of "prison-made knife" in the list of elements, the

---

[2] An unusual procedural twist in *Medley* affected its analysis of whether the instruction was simply a matter of state law.  Specifically, the "reasoned decision" the Ninth Circuit was looking at was the trial court's pretrial determination that the flare gun would qualify as a firearm if it had the physical characteristics mentioned in the state statute.  *See Medley*, 506 F.3d at 862-63 ("Although terse, this pretrial ruling constituted the last reasoned decision" for federal habeas purposes"); *but see id.* at 868 (Ikuta, J., concurring in part and dissenting in part) (concluding that the majority erred; the pretrial ruling by trial court did not adjudicate the due process claim and therefore was not subject to § 2254(d)).  The pretrial ruling to which the Ninth Circuit applied § 2254(d) had not addressed the statute's requirement that the alleged firearm be "designed to be used as a weapon."

"instructions as a whole were not misleading or inadequate to guide the jury's deliberation" and there was "no 'reasonable likelihood' that the jury convicted [the defendant] without proof beyond a reasonable doubt that he used a 'dangerous weapon.'" *Id.* at 1102-03.  There was a "close connection between the special instruction requiring the jury to find proof beyond a reasonable doubt that the defendant used a 'prison-made knife' and the immediately following instruction informing the jury that 'a prison-made knife is a dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury.'" *Id.* at 1103.  It was "not reasonably likely that the jury believed that it could convict [the defendant] without proof beyond a reasonable doubt that the 'prison made knife' was 'used in a way that is capable of causing death or serious bodily injury.'" *Id.*  The other instructions aided this interpretation by highlighting the need for a "dangerous weapon," i.e., one instruction listed the charge as "assault with a dangerous weapon" and another instruction explained the need for the jury to be convinced beyond a reasonable doubt that the defendant was guilty of "assault with a dangerous weapon." *Id.*  The *Smith* court distinguished the "prison-made knife" instruction from the "flare gun is a firearm" instruction found deficient in *Medley*: in *Medley*, the trial judge "plainly instructed the jury that the defendant's flare gun met the sentencing enhancement statute's definition of a 'firearm'" and thereby took away from the jury the critical decision as to whether the defendant used something that was a firearm, whereas here, the "court never took such a critical issue away from the jury's determination because the district court never instructed the jury that [defendant's] prison-made knife was a dangerous weapon." *Id.* at 1103.

      The combined message of *Stanton*, *Medley* and *Smith* is that not every instruction tailored to the facts of a case impermissibly usurps the jury's function.  Rather, the court must focus on whether the instruction actually eliminates the fact-finding role of the jury as to one or more elements with its case-specific wording.

      In *Medley*, the jury instruction impermissibly eliminated a portion of the definition of a firearm; a jury following that instruction could find the defendant guilty without finding that the flare gun was "designed to be used as a weapon," although it had never been determined by a state court or statute that a flare gun was a firearm within the meaning of the statute or that a flare gun

12

was a firearm as a matter of law. By contrast, the instruction in Mr. Gonzalez's case did not eliminate the "inhabited dwelling" element of first degree robbery, and a jury following that instruction could not find him guilty without making certain findings, i.e., that the hotel room was occupied and paid for, and that he had committed the robbery in an "inhabited dwelling" as so defined.

Mr. Gonzalez's situation is much more similar to *Stanton*; in both cases the instruction had been determined to be correct statements of state law. In *Stanton*, other state statutes had identified arsenic trioxide as a poison, and in Mr. Gonzalez's case, the state appellate court had determined that, under California law, an occupied hotel room for which a fee had been paid was an inhabited dwelling. In Mr. Gonzalez's case, the jury following the instruction still had to find that the hotel room was occupied and paid for to find that it was an inhabited dwelling, and if neither of those existed, the hotel room was not an inhabited dwelling and the jury would not have found him guilty of first degree robbery. *Medley* did not criticize the approach of *Stanton*; instead *Medley* involved a situation where it had not been determined that a flare gun was a firearm as a matter of law – a situation that arose because of the unusual twist that the only "reasoned decision" was a pretrial ruling. *See Medley*, 506 F.3d at 864 n.5 ("There is no dispute that we are bound by a state trial court's interpretation of a state law, whether delivered as part of a jury instruction or anywhere else. . . . [W]e do not think that the trial court's jury instruction, or the court's in limine ruling on the issue, can plausibly be construed as an interpretation of state law.")

Mr. Gonzalez's case also is like *Smith* in that the overall charge to the jury made it clear to the jury that the jury had to find the element proven beyond a reasonable doubt. In *Smith*, the instructions as a whole did not relieve the Government of its obligation to prove beyond a reasonable doubt that the defendant had used a dangerous weapon, and a reasonable jury could not have made that finding without finding that the prison-made knife was "used in a way that is capable of causing death or serious bodily injury," which was a correct definition of the offense's "dangerous weapon" element. In Mr. Gonzalez's case, the jury charge clearly conveyed that, to prove first degree robbery, the "'People have the burden of proving beyond a reasonable doubt that the robbery was first degree rather than a lesser crime,'" and the jury had to find Mr. Gonzalez "'not

guilty of first degree robbery'" if the prosecutor did not meet that burden. Cal. Ct. App. Opinion at 7. Mr. Gonzalez's instructions also set out the elements of first degree robbery that the prosecutor "'must prove,'" including that the robbery was "'committed in an inhabited dwelling. A dwelling is inhabited if someone lives there and either is present or has left but intends to return. Under the law, an occupied hotel room for which room a fee has been paid is an inhabited dwelling.'" *Id.* Critically, the jury had to find not only a fee had been paid for the hotel room, but that the hotel room was in fact "occupied." As the prosecutor pointed out in closing argument, the victim's use of the room had to be something more than "transitory" and that here the victim had been in the room before and had returned, it was night time, and she had personal property stored in the room; the prosecution noted that ultimately it was for the jury to decide. Thus, as the prosecutor acknowledged, the jury could return a not guilty verdict based on its fact-finding on the inhabited dwelling element. Accordingly, the jury instructions did not direct a verdict on that element or displace the jury's role in finding each element of the crime proven beyond a reasonable doubt.

The California Court of Appeal's rejection of Mr. Gonzalez's claim that the jury instruction directed a verdict on the "inhabited dwelling" element of first degree robbery or otherwise violated his due process right to have the jury find each element of the offense proven beyond a reasonable doubt before returning a verdict of guilty was not contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court. The state appellate court reasonably concluded that the jury's role had not been usurped by the instruction because a jury following that instruction still had to find that the "inhabited dwelling" element was present to convict on each robbery count, and to make subsidiary factual determinations (including finding the victim occupied the room) to find that the "inhabited dwelling" element existed. The trial court "did not instruct the jury that the victims' hotel rooms were inhabited dwellings." Cal. Ct. App. Opinion at 12. Mr. Gonzalez is not entitled to the writ on his instructional error claim.

B.    Cruel And Unusual Punishment Claim

Mr. Gonzalez was sentenced to a total of 50 years in prison. He was sentenced under California Penal Code section 667.61, which requires an indeterminate sentence of 25 years to life in

prison for specified sex crimes with specified aggravating circumstances.[3] Mr. Gonzalez was required to be sentenced under section 667.61 because he had committed rape and forcible oral copulation with the aggravating circumstances that he had personally used a deadly and dangerous weapon during the commission of each offense and had committed the offenses against more than one victim. *See* Cal. Ct. App. Opinion at 2. Mr. Gonzalez does not dispute that the statute mandated the two consecutive 25-to-life sentences (totaling 50 years to life in prison), and argues instead that his sentence under that statute of 50 years to life amounts to cruel and unusual punishment.

---

[3] At the time of Mr. Gonzalez's trial, California Penal Code section 667.61 provided:

(a) Any person who is convicted of an offense specified in subdivision (c) under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 25 years to life.

(b) Except as provided in subdivision (a), any person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for 15 years to life.

(c) This section shall apply to any of the following offenses:

    (1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261.

    * * *

    (7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 288a.

    * * *

(e) The following circumstances shall apply to the offenses specified in subdivision (c):

    * * *

    (4) The defendant personally used a dangerous or deadly weapon or firearm in the commission of the present offense in violation of Section 12022, 12022.3, 12022.5, or 12022.53.

    (5) The defendant has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim.

1.     State Court Rejection

The California Court of Appeal rejected Mr. Gonzalez's Eighth Amendment claim. The court explained that the purpose of section 667.61, referred to as the "One Strike law," "is to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction, where the nature or method of the sex offense place[d] the victim in a position of *elevated vulnerability.*" Cal. Ct. App. Opinion at 14 (citations omitted). The state appellate court rejected Mr. Gonzalez's argument that section 667.61 improperly used the fact of multiple victims twice, by using the multiple victims as a reason for the enhanced sentence and then by making the sentences consecutive.

> "'[P]ersons convicted of sex crimes against multiple victims within the meaning of section 667.61, subdivision (e)([4]) "are among the most dangerous" from a legislative standpoint. "[I]n making multiple convictions for violent sex offenses punishable by multiple life sentences, the Legislature was expressing the view that multiple violent sex offenses deserve more severe punishment than a single violent sex offense because of the predatory nature of the perpetrator." (*People v. Murphy* (1998) 65 Cal.App.4th 35, 41.) " 'The One Strike [law] therefore contemplates a separate life term for each victim attacked on each separate occasion.' *(People v. Wutzke* (2002) 28 Cal.4th 923, 930–931.)"
>
> We see no relevance to Gonzalez's doubt that there are any states which would provide life sentences, with no room for the trial court to impose a lesser sentence, for the offenses in question. "The purpose of the One Strike law is 'to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction,' 'where the nature or method of the sex offense "place[d] the victim in a position of *elevated vulnerability.*" Even if California's sentencing scheme "is among the most extreme in the nation," such a determination "does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code." *(People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.) "[A] sentence which is not otherwise cruel and unusual" does not become "so simply because it is 'mandatory.' " *(Harmelin v. Michigan, supra*, 501 U.S. at p. 995 [first-time offender convicted of possessing 672 grams of cocaine sentenced to life in prison without the possibility of parole; held, sentence not so grossly disproportionate as to violate Eighth Amendment].)

Cal. Ct. App. Opinion at 15-16 (alterations in original; some citations omitted).

The California Court of Appeal also rejected Mr. Gonzalez's argument that his crimes and his background did not support the lengthy sentence he received.

> In arguing the life terms are unconstitutional as applied to him, Gonzalez asks us to consider his lack of a prior criminal record, that both victims were actively engaged in prostitution and continued to ply their trade after the offenses occurred, and that neither victim was harmed. However, these factors do not render his sentence unconstitutional. While 26 and 27 years of age, Gonzalez, armed with knife, terrorized each woman, threatening to harm them if they did not comply with his demands, and sexually assaulted them. Despite his lack of a prior criminal record, his substantial sexual predatory behavior put the community at risk.

> We see no relevance either to Gonzalez's reliance on the women's occupations as paid escorts for sexual favors, or his argument that the victims suffered no physical harm. The Legislature has found the commission of violent sexual offenses is deserving of harsh punishment even in the absence of any physical injury to the victims. (*See, e.g.*, § 263["[t]he essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape"].) Gonzalez apparently planned his attacks and selected victims who were not likely to report his predatory conduct and, if they did, they were not likely to be believed by the authorities. During his presentence interview, he displayed no degree of remorse.

Cal. Ct. App. Opinion at 17 (alterations in original; footnote omitted).

Finally, the state appellate court rejected the argument that the sentence was unconstitutional because it was a greater sentence than the 15-years-to-life that would be imposed for a second degree murder.

> [T]he Legislature "has chosen to make other offenses not involving homicide punishable by life imprisonment without possibility of parole," including aggravated kidnapping for ransom and attempted train wrecking, and "[s]uch sentences have been found not to constitute cruel or unusual punishment because the Legislature could reasonably decide that crimes which involve an inherent danger to the life of the victim are particularly heinous even if no death occurs." (*Id.* at ¶. 807–808.) In this case, the commission of oral copulations by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" (§ 288a, subd. (c)(2)(A)), "self-evidently entails a threat to the life of the victim[s]." (*Crooks, supra,* 55 Cal.App.4th at p. 808.) "A fortiori, if offenses such as aggravated kidnapping for ransom and attempted train wrecking, even absent death, may be punished by [life without parole] without offending California's bar against cruel or unusual punishment, it cannot offend that constitutional provision to punish the combination of offenses defendant committed by a life sentence with the possibility of parole." (*Ibid.*)

Cal. Ct. App. Opinion at 18.

### 2. Analysis of Eighth Amendment Claim

The Eighth Amendment's "Cruel and Unusual Punishments Clause prohibits the imposition of inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 59 (2010). "For the most part, however, the [Supreme] Court's precedents consider punishments challenged not as inherently barbaric but as disproportionate to the crime." *Id.* The Eighth Amendment contains a "narrow" proportionality principle – one that "does not require strict proportionality between crime and sentence," and forbids only "extreme sentences that are 'grossly disproportionate' to the crime." *Id.* at 59-60. "[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289-90 (1983); *see also Crosby v. Schwartz*, 678 F.3d 784, 795 (9th Cir. 2012) ("Circumstances satisfying the gross disproportionality principle are rare and extreme,

1  and constitutional violations on that ground are 'only for the extraordinary case'"). Only in that rare
2  case where a comparison of the gravity of the offense and the severity of the sentence leads to an
3  inference of gross disproportionality does the court compare a petitioner's sentence with sentences
4  for other offenders in the jurisdiction, and for the same crime in other jurisdictions, to determine
5  whether it is cruel and unusual punishment. *Graham*, 560 U.S. at 60.

6  A sentence of life in prison (or 25-years-to-life) for a murder does not lead to an inference of
7  gross disproportionality and therefore does not amount to cruel and unusual punishment forbidden
8  by the Eighth Amendment. *See United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under
9  *Harmelin [v. Michigan,* 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder
10 does not constitute cruel and unusual punishment"); *cf. Solem*, 463 U.S. at 290 n.15 (discussing
11 earlier case in which it had found the death penalty to be excessive for felony murder in the
12 circumstances of a particular case; "clearly no sentence of imprisonment would be disproportionate"
13 for the felony murder of an elderly couple).

14 Lengthy sentences for crimes less serious than murder also have been upheld by the Supreme
15 Court and Ninth Circuit. *See e.g., Ewing v. California*, 538 U.S. 11, 29-31 (2003) (upholding
16 sentence of 25-years-to-life for recidivist convicted most recently of grand theft); *Lockyer v.
17 Andrade*, 538 U.S. 63, 76 (2003) (upholding sentence of two consecutive terms of 25-years-to-life
18 for recidivist convicted most recently of two counts of petty theft with a prior conviction); *Harmelin*,
19 501 U.S. at 996 (upholding sentence of life without possibility of parole for first offense of
20 possession of 672 grams of cocaine); *Nunes v. Ramirez-Palmer*, 485 F.3d 432, 439 (9th Cir. 2007)
21 (upholding sentence of 25-years-to-life for the underlying offense of petty theft with a prior
22 conviction after finding petitioner's criminal history was longer, more prolific, and more violent
23 than the petitioner's in *Andrade*, who suffered a harsher sentence); *Taylor v. Lewis*, 460 F.3d 1093,
24 1101-02 (9th Cir. 2006) (finding no inference of gross disproportionality and upholding sentence of
25 25-years-to-life with possibility of parole for possession of .036 grams of cocaine base where
26 petitioner served multiple prior prison terms and his prior offenses involved violence and crimes
27 against a person); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 508 (9th Cir. 1994) (sentence of
28

ineligibility for parole for 40 years not grossly disproportionate when compared with gravity of sexual molestation offenses).

Under the test articulated by the U.S. Supreme Court, the court "must begin by comparing the gravity of the offense and the severity of the sentence" to determine whether it "leads to an inference of gross disproportionality." *Graham*, 560 U.S. at 60. Here, Mr. Gonzalez's sentence totaling 50-years-to-life for his crimes does not raise an inference of gross disproportionality to his offenses, even if he is never granted parole and must spend his entire life in prison on that sentence. One of his 25-to-life sentences resulted from him being found guilty of forcible oral copulation of one victim with personal use of a deadly and dangerous weapon, i.e., a knife. The other of his 25-to-life sentences resulted from him being found guilty of two counts of forcible oral copulation and one count of rape of the second victim with personal use of a deadly and dangerous weapon, i.e., a knife. He threatened to harm each victim if the victim did not accede to his demands for money and sex. The crimes were not part of a single criminal episode. The choice of prostitutes as victims reflected planning by Mr. Gonzalez and a choice of victims who were not likely to call the police. He was not a youthful offender. Although he had no felony record, Mr. Gonzalez's crimes were very serious, and far more serious than many of the crimes as to which the Supreme Court has upheld lengthy prison sentence, such as the 25-to-life for grand theft with prior convictions in *Ewing*, the consecutive 25-to-life sentences for two counts of petty theft with a prior conviction in *Andrade*, the life-without-parole for first time possession of cocaine in *Harmelin*. Mr. Gonzalez's sentence totaling 50 years to life for his particular crimes does not result in a belief that his is one of those "rare case[s]" in which the comparison "leads to an inference of gross disproportionality." *Graham,* 560 U.S. at 60. He has not shown an Eighth Amendment violation. The California Court of Appeal's rejection of Mr. Gonzalez's Eighth Amendment claim was not contrary to or an unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court. He is not entitled to the writ on this claim.

C.      A Certificate Of Appealability Will Not Issue

Mr. Gonzalez has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and this is not a case in which "reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI. CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

IT IS SO ORDERED.

Dated: September 30, 2015

_____
EDWARD M. CHEN
United States District Judge